**Lois M. GRANT, on behalf of herself and all other similarly situated persons, Plaintiffs,**

v.

**Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.**

No. 3:CV–88–0921.

United States District Court, M.D. Pennsylvania.

Feb. 21, 1990.

---

Michael F. Brown, Stephenson & Brown, Harrisburg, Pa., Fred H. Hait, Griffie, Turo & Grell, Carlisle, Pa., Laurence E. Norton, II, Pennsylvania Legal Services Center, Peter Zurflieh, Central Pennsylvania Legal Services, Harrisburg, Pa., Louise O. Knight, Clement & Knight, Lewisburg, Pa., for plaintiffs.

James J. West, U.S. Atty., Bruce Brandler, Asst. U.S. Atty., Harrisburg, Pa., John R. Bolton, Asst. Atty. Gen., Sheila Lieber, Felicia L. Chambers, U.S. Dept. of Justice, Federal Programs Branch Civ. Div., Washington, D.C., for defendant.

## OPINION

MUIR, District Judge.

### I. Introduction.

Lois M. Grant commenced this action by filing a complaint in which she named as the Defendant the Secretary of Health and Human and Services (Secretary) seeking reversal of a final decision of the Secretary denying her benefits under the Social Security Disability Insurance Program, estab-lished by the Social Security Act, 42 U.S.C. § 401, et seq. Grant based her claim for relief upon two theories: (1) the Secretary's decision was not supported by substantial evidence and was contrary to law and (2) Administrative Law Judge (ALJ) Russell Rowell who presided over Grant's hearing and rendered a decision denying her application for disability benefits was biased against her and against disability claimants generally, thus denying her a fair hearing in violation of the Social Security Act and the due process clause of the Fifth Amendment.

On August 12, 1988, Grant and additional Plaintiffs Jamie P. Donnelly and Harold Wallace filed an amended complaint on behalf of themselves and a proposed class of individuals. On November 10, 1988, the Plaintiffs filed a motion for class certification in which they requested that the Court certify the following class: all claimants for Social Security disability or Supplemental Security Income disability benefits, or both, "who have received, or will receive, an adverse decision from Administrative Law Judge Russell Rowell on or after January 1, 1985, and all disability claimants whose claims have been or will be assigned to ALJ Rowell for a decision." The Secretary filed a motion to dismiss the allegations concerning ALJ Rowell and for a stay of proceedings on December 12, 1989. This motion was sent to Magistrate Raymond J. Durkin for preliminary consideration on December 13, 1989, by the Clerk of Court in Scranton. The Court also sent a copy of the motion to Magistrate Durkin on or about December 26, 1989.

The Court held a hearing on the motion on January 22 through January 24, 1990. Our findings of fact, discussion, and conclusions of law follow.

### II. Findings of Fact.

A. *Numerosity*

1. There are at least 195 persons whose claims for Social Security disability or Supplemental Security Income disability benefits, or both, were denied by ALJ Rowell after January 1, 1985, who filed no further appeals from such denials and whose 60 day period for filing an appeal has expired.

2. There are at least 251 persons whose claims for Social Security disability or Supplemental Security Income disability benefits, or both, were denied by ALJ Rowell after January 1, 1985, who filed further administrative appeals which were denied.

3. There are also at least 22 persons whose claims were denied by ALJ Rowell after January 1, 1985, and who filed further administrative appeals, which resulted in reversals. Whether any of these persons received either complete reversals, awarding them all the benefits that they claimed before ALJ Rowell, or partially favorable decisions has not yet been determined.

4. There were approximately 153 persons whose claims for Social Security disability or Supplemental Security Income disability benefits, or both, had been assigned to ALJ Rowell, but which were not yet decided by him as of October 10, 1989.

5. As of October 10, 1989, there were approximately 153 persons whose disability claims has been assigned to ALJ Rowell but which had not yet been decided by him. Undisputed (U)

6. There are 21 persons whose claims were denied by ALJ Rowell since January 1, 1985, whose claims are within the time period for an administrative or judicial appeal. (U)

7. There are 73 persons whose claims were denied by ALJ Rowell since January 1, 1985, whose claims are currently on appeal before the agency or a court. (U)

8. The class also includes those claimants for Social Security disability or Supplemental Security Income disability benefits, or both, whose claims will be assigned to ALJ Rowell in the future. The Defendant estimates that ALJ Rowell has been assigned approximately 301 Social Security disability and Supplemental Security Income disability cases per year since 1985. (U)

9. The Plaintiff class numbers approximately 700 persons, excluding those claimants whose claims will be assigned to ALJ Rowell for a hearing in the future.

10. Because ALJ Rowell has conducted hearings in at least Pennsylvania, Maryland, West Virginia, Virginia, and Washington, D.C. during the relevant time period, Plaintiffs' class definition would include a class which would exist in the Courts of Appeals for the Third, Fourth, and District of Columbia Circuits.

### B. *Common Questions of Law and Fact*

11. The Plaintiffs' claim of general bias requires the following determinations of fact common to the class as a whole:

(a) Is ALJ Rowell inclined to deny benefits to claimants in every disability case coming before him? (*See* amended complaint, ¶'s 21, 37, 50, 55, 59).

(b) Does ALJ Rowell effectuate this general bias against claimants, in large part, by finding that the testimony of claimants and their witnesses is not credible? (*See* amended complaint, ¶'s 22, 37, 50).

12. Plaintiffs' claim of general bias requires the following determinations of law common to the class as a whole:

(a) Does an inclination on the part of an ALJ to deny all claims, effectuated largely by the use of adverse credibility findings, deny claimants coming before him (1) their statutory right to a fair hearing (*see* amended complaint, ¶ 59) and (2) their due procss rights protected by the Fifth Amendment to the United States Constitution? (*See* amended complaint, ¶ 61).

(b) Is injunctive relief against the Secretary appropriate to remedy the deprivation of Plaintiffs' rights and to avoid further violations of their statutory and constitutional rights? (*See* amended complaint, ¶'s 60, 62, p. 15(a), (c)).

### C. *Typicality*

13. The claims of Lois M. Grant are typical of the claims of the class, as she contends that: (1) she was denied Social Security disability or Supplemental Security Income disability benefits, or both, by a decision of ALJ Rowell after January 1, 1985 (*see* amended complaint, ¶'s 21, 36,

49); (2) ALJ Rowell is biased generally against disability claimants and, therefore, was predisposed to deny her claim as well as those of all others coming before him (*see* amended complaint ¶'s 22, 37, 50); (3) she was denied her statutory right to a fair hearing and her constitutional right to due process of law by having her claim determined by a biased ALJ (*see* amended Complaint, ¶'s 55, 59, 61); and (4) she is entitled to an order from this court requiring the Secretary to provide her with a new hearing before another ALJ (*see* amended complaint, ¶'s 60, 62, and page 15(d) and (e)).

14. On February 23, 1988, Plaintiff Harold Wallace filed an individual action alleging the Defendant's decision denying him disability benefits was without substantial evidence and alleging that ALJ Rowell was biased. *Wallace v. Sullivan*, No. 88–0295, 1989 WL 109098 (M.D.Pa.) (Muir, J.). (U)

15. On August 4, 1989, ALJ John Rush recommended that Harold Wallace be granted benefits. The Appeals Council adopted that recommendation on October 11, 1989, but reopened it on December 29, 1989, because of earnings reported to the claimant's records in 1986, 1987, and 1988 and because the claimant also worked in 1989.

16. On June 6, 1989, this Court remanded Plaintiff Donnelly's individual action to the Secretary for further proceedings without addressing the bias claim. On December 12, 1989, ALJ J. Robert Brown granted Donnelly's claim for benefits. (U)

17. On February 1, 1990, the Court granted a motion by Jamie P. Donnelly to withdraw as class representative in this case.

D. *Adequacy of Class Representation*

18. The claim of Grant is typical of the claims of the class and her interests coincide with the interests of the class she seeks to represent.

19. There are no apparent conflicts of interest between Grant and members of the class.

20. Grant has a general understanding of the general bias claim and her role as a class representative, and she is otherwise a fair and adequate representative of the class.

21. Counsel Peter Zurflieh and Larry Norton are experienced in federal litigation, including class action litigation. (U)

22. Apart from the disputed claim of the Defendant that counsel Peter Zurflieh and Larry Norton are not competent and capable of fairly and adequately representing the interests of the class, because their ability fairly and competently to represent the class is tainted by an alleged conflict that exists with counsel of record, Michael F. Brown, counsel Peter Zurflieh and Larry Norton are competent and capable of fairly and adequately representing the interests of the class. (U)

23. Counsel Peter Zurflieh and Larry Norton are competent and capable of fairly and adequately representing the interests of the class.

24. One of the attorneys formerly of record in this case, Michael F. Brown, was previously a staff attorney for the Social Security Administration, Office of Hearings and Appeals, and as such worked with ALJ Rowell on a daily basis from November, 1981, through December, 1984. (U)

25. Brown represented Jamie Donnelly.

26. Brown has participated in the litigation of this case, including conferring with co-counsel regarding matters, such as strategy, up to October 3, 1988. Since October 3, 1988, Brown's participation in this action, otherwise, has been to provide information concerning evidence that may exist to prove the claim of general bias of ALJ Rowell. The notes of counsel Larry Norton provide the following personal or telephone conferences with Brown after October 3, 1988: 11/17/88 telephone call, 1/11/89 telephone call, 8/9/89 personal conference, 8/21/89 telephone call, 9/8/89 telephone call, 10/31/89 telephone call. (U)

E. *Health and Human Services Has Acted on Grounds Generally Applicable to the Class*

27. The Department of Health and Human Services, through its Office of Hear-

ings and Appeals within the Social Security Administration, continues to assign Social Security disability and Supplemental Security Income disability claims for benefits to ALJ Rowell for his determination. (U)

28. The Secretary treats the determinations made by ALJ Rowell in the same manner that he treats determinations of his other administrative law judges. (U)

F. *Irreparable Harm*

29. Grant has an after tax income of $353 per month. Grant received a settlement of $28,000 from an accident at work, most of which she deposited in a certificate of deposit earning approximately 7.7% annually. She deposited approximately $3,500 of that in a credit union account earning approximately 7% per annum. Grant purchased a 1981 Thunderbird three years ago for $3,500. Grant lives with her mother, but sublets her apartment to another person who pays the rent of $195 per month.

30. Attorney Jon Lyons is a specialist in Social Security disability law. In the years that he has been engaged in this practice Lyons has handled about one hundred Social Security or Supplemental Security Income disability cases. (Lyons Tr. pp. 7–9).

31. Claimants for Social Security disability and Supplemental Security Income disability benefits very frequently are out of work or are engaged in reduced work for more than 17 months before applying for benefits. (Lyons Tr. pp. 19, 59).

32. The claimants represented by Lyons are often in severe financial hardship in that their income has been reduced by half or more since the time they were employed. (Lyons Tr. p. 17).

33. Lyons' disability clients are typically wage-earners who are no longer able to work and whose income has stopped. They frequently are not insured by private insurance and do not have disability or medical insurance through their former employers. Yet, they do not qualify for Medicaid. Once they are no longer able to work, their source of funding for medical care and medication stops. (Lyons Tr. pp. 25–26).

34. In Lyons' experience, claimants for disability require continued medical treatment. (Lyons Tr. p. 30).

35. Seventy percent or more of Lyons' cases are back pain cases. For these claimants, palliative treatments, such as prosthetic devices, pain medication, transcutaneous electronic stimulators, and nerve blocks would substantially relieve their pain. (Lyons Tr. pp. 31, 66, 68, 72).

36. Lyons' clients lack sufficient income or insurance resources to get adequate treatment for their conditions, including treatment for pain. (Lyons Tr. pp. 31, 66)

37. If determined eligible for disability benefits, these claimants would have monthly income from which to purchase pain medication and, after the twenty-fifth month of entitlement, would receive Medicare benefits which could help fund further medical procedures. (Lyons Tr. p. 65)

38. The Information Protection and Advocacy Center for Handicapped Individuals in Washington, D.C. provides representation to approximately 250 Social Security disability and Supplemental Security Income disability claimants per year in the administrative appeal process. Of these cases, about 50 per year proceed to the Administrative Law Judge level for hearings. Joan Christopher Jones, Esquire, represents the agency's clients at these hearings and supervises the work done on all disability claims handled by the agency. Attorney Jones has been employed by the agency for over four years. (Jones Tr., pp. 4, 5, 6, 7).

39. At least half of the Social Security disability and Supplemental Security Income disability claimants represented by the Information Protection and Advocacy Center for Handicapped Individuals have been out of work for several years before they come to the agency for assistance in pursuing their applications for disability benefits. (Jones Tr., pp. 17–19).

40. Nearly all claimants for Social Security disability and Supplemental Security Income disability benefits have severe medical or emotional impairments, as de-

fined by the Social Security Act and its regulations. (Lyons Tr. pp. 29–30).

41. From the time of application for benefits it takes approximately 12 to 18 months for the average claimant to obtain a decision from an Administrative Law Judge, and then if there is an adverse decision, an additional 3 to 6 months to obtain a decision of the Appeals Council, with some cases taking as long as 12 months. If the case is remanded by the Appeals Council, another 6 to 10 months is added to the administrative appeal process. (Lyons Tr., pp. 12–13; Jones Tr. pp. 19, 20, 22).

42. Many class members who are in the midst of this process subsist on minimal public assistance payments while awaiting a determination of their claims. (Lyons Tr. pp. 26–27; Jones Tr. p. 8).

43. Of the 250 claimants per year represented by Jones and the agency for which she works, over 90 percent subsist on general public assistance benefits of $248.00 per month. Many of these claimants also receive food stamps, but not more than $99 per month. (Jones Tr., p. 8)

44. These class members who are public assistance recipients lack many basic necessities. (Jones Tr. pp. 11–16; Campbell Tr., pp. 14–16).

45. About 5 to 10 percent of the 250 claimants that Attorney Jones' agency represents stay in shelters. A typical shelter where these claimants stay contains 50 or so beds per room, spaced very close together with no sheets or linens on the beds; lacks a security area or personal space area; and has a dormitory style bathroom. Residents of the shelter are not permitted to come and go as they please, but must remain in the shelter once they come in for the night or risk losing their beds. (Jones Tr. pp. 11–16).

46. Class members who are covered by Medicaid cannot obtain the necessary medical and dental services which they need. (Hale Tr. pp. 9–10; Campbell Tr. pp. 16–22).

47. Class members who do not receive public assistance, because they have earned income from spouses, other disability income, or for other reasons, sometimes experience financial hardship while awaiting a determination of their claims. (Taylor Tr. pp. 7–9, 16; Lyons Tr. pp. 17–18).

48. Claimants who have private medical insurance do not obtain all of their necessary medical and dental services because such insurance is often not comprehensive. (Taylor Tr. pp. 7–12).

49. The medication referred to in the previous paragraph includes medication that claimants need for their diagnosed conditions and for pain. (Taylor Tr. pp. 10–11; Lyons Tr. pp. 32–33, 72–73).

50. At least some class members have no cash income whatsoever. (Hale Tr. p. 7).

51. Class member Barbara Campbell filed an application for Social Security disability and Supplemental Security Income disability benefits in December, 1986. She had a hearing before ALJ Rowell in January, 1989, but has not yet received a decision on her claim. (Campbell Tr. p. 5, 8, 9).

52. During the three years that her disability case has been pending before the agency, Campbell and her 16 year old son have subsisted on welfare cash assistance payments from the State of Maryland. Since September, 1989, Campbell has received $309 per month in welfare assistance. Prior to that, she received about $280 per month. (Campbell Tr. p. 9).

53. Campbell and her son also receive Medicaid and food stamps. In the three years since she applied for disability benefits, Campbell's food stamps have increased only from $119 per month to $140 per month. (Campbell Tr. p. 9).

54. Campbell and her son have lived in subsidized housing since June, 1988. She pays $76 per month in rent. During the years that Campbell was waiting for public housing to become available she lived in an apartment with a rent payment of almost $500 per month. She needed help constantly from members of her church to pay the rent. (Campbell Tr. pp. 10–11).

55. If Campbell is found to be disabled, she will receive at least $380 per month in

benefits. Her son would still be eligible for $153 per month in welfare assistance. (Campbell Tr. p. 11).

56. Campbell suffers from severe back and joint pain, due to rheumatoid arthritis, asthma, a seizure disorder, and tempero manibular joint disorder. Because of her impairments and associated pain, Campbell must spend about 90 percent of her time in bed. In order for Campbell to move anywhere from her bed she must use a wheelchair. When the weather is cold or rainy, Campbell's back pain intensifies to the point that she cannot even get into her wheelchair. (Campbell Tr. pp. 6–8).

57. Campbell must spend $200 per month or more on oxygen for her asthma condition. This expense is not covered by Medicaid. Without the oxygen, Campbell would have severe asthma attacks. (Campbell Tr. pp. 11–12, 15).

58. After paying $200 for oxygen, $76 for rent, and about $30 for her phone bill, Campbell has virtually no money left over for other necessary expenses. (Campbell Tr. p. 11).

59. Sometimes, when the oxygen tank is two-thirds depleted, Campbell reduces her oxygen use more than she should in order to make it last until she receives her next assistance check. In the past, before Campbell realized how badly she needed the oxygen, she reduced it too much, causing her to have more asthma attacks. (Campbell Tr. pp. 12–13).

60. Campbell's food stamp benefits do not cover the non-food items she needs for her home, such as soap powder, soap, deodorant, toothpaste, toilet paper, trash bags, etc. (Campbell Tr. pp. 14–15).

61. The food stamp benefits Campbell and her son receive are generally used up about half way through the month. To make the food stamps last even this long, Campbell must skimp on meat for her son and do without meat completely for herself. She is also unable to obtain enough fresh vegetables for herself and her son. (Campbell Tr. pp. 13–14, 16).

62. Campbell feels ashamed to have to ask others to buy food and essential household items for her. Having to rely on the help of others for necessities each month causes her stress. She considers it dehumanizing to have to ask others to provide her with such basic items as toilet paper. (Campbell Tr. pp. 15, 23).

63. Because Campbell is unable to exercise and maintain a proper diet, including sufficient protein for her muscles, she has experienced a problem with weight gain. Since she became restricted to her bed, Campbell has gained 120 pounds. Her doctors and her physical therapist have recommended that she enroll in a nutrition program in order to reduce her weight and ensure proper nutrition. Campbell has not been able to afford the cost of such a program. (Campbell Tr. pp. 16–18).

64. Campbell's physical therapist recommended several years ago that she enter a therapy program utilizing a heated pool. This same course of treatment was recommended to her again, more recently, by another physical therapist. (Campbell Tr. pp. 17–18, 19).

65. With the recommended therapy, Campbell could be rolled into the pool in her wheelchair so that her whole body would be immersed. She would be better able to move her joints and could experience the soothing effects of the heated water. Such therapy would strengthen her muscles and afford her badly needed relief from her back and joint pain that she otherwise cannot get. (Campbell Tr. pp. 18–19).

66. It would cost Campbell $50 to $75 per month to receive this therapy twice a week. Because of her very limited financial means, and the need for her to purchase oxygen each month, Campbell cannot afford the heated water therapy treatment for her pain. She could probably afford this therapy if she were receiving Social Security disability or Supplemental Security Income disability benefits. (Campbell Tr. pp. 19–20).

67. Campbell requires treatment from a dentist for her tempero mandibular joint disorder which is a pain producing condition. Her Medicaid benefits, however, do not cover dental expenses. Campbell found a dentist who has been willing to

treat her based on her promise to pay him out of any retroactive Supplemental Security Income benefits she may receive. Campbell has already incurred dental expenses exceeding $2,000. (Campbell Tr. pp. 20–21).

68. Campbell suffers from spasms in her right jaw, related to the tempero mandibular joint disorder. When these spasms are not treated they travel down the whole right side of her body and also cause neurological headaches. Regular pain medication, such as Percodan and Valium, is not enough to stop the spasms. The most effective treatment is for Campbell to receive injections directly into her jaw by the dentist. Because of her uncertainty about being able to pay the dentist, however, Campbell does not go to the dentist as often as needed for treatment of her tempero mandibular joint disorder pain. (Campbell Tr. pp. 7, 21–22).

69. Five-year-old class member Bennie Ray Taylor, whose claim is currently before the agency, is a member of a family with income greater than that which allows for eligibility for cash welfare assistance, medicaid, or food stamps in the Commonwealth of Virginia. (Taylor Tr. pp. 4, 15).

70. Bennie Ray suffers from a seizure disorder, a learning disability, and a speech and language impediment. (Taylor Tr. p. 5).

71. In the winter months, Bennie Ray suffers upper respiratory tract infections which last as long as six weeks at a time. (Taylor Tr. p. 10).

72. Even with his parents' household income, while awaiting a determination of his claim for benefits, medical providers from whom he received services continuously harass his family for unpaid medical bills. His parents have been defendants in two suits filed by medical providers, and they have had to borrow money from a finance company to pay these providers. (Taylor Tr. pp. 8–9).

73. In order to pay one of the medical providers that sued them, Bennie Ray's parents had to borrow $600 at a 24% interest rate. The monthly payment on this debt alone is $81.00. (Taylor Tr. pp. 8–9).

74. In total, Bennie Ray's parents owe over $1,000 in medical bills for Bennie Ray's treatment. Their monthly payments on these bills add up to more than $200. (Taylor Tr. pp. 7, 16).

75. Because of their limited financial means, Bennie Ray's parents sometimes have to choose between making these payments and buying food for their children. (Taylor Tr. pp. 7–8).

76. Bennie Ray Taylor's parents have not been able to provide him with required dental attention. In the Fall of 1988, Bennie Ray became ill with a toothache and had to be hospitalized for five days. (Taylor Tr. pp. 9–10).

77. The dentist advised Mrs. Taylor that Bennie Ray needs extensive dental work, including retainers, crown work, and further hospitalization to have more teeth removed. Bennie Ray's parents cannot afford to have this dental work performed. (Taylor Tr., pp. 9–10).

78. Bennie Ray's parents cannot afford to purchase prescription drugs for Bennie Ray's respiratory tract infections in sufficient amounts to clear up the infections. (Taylor Tr. p. 10).

79. Sometimes Bennie Ray's parents are unable to take him to the doctor for his respiratory tract infections because they have no funds, causing Bennie to miss a great deal of school. (Taylor Tr. pp. 10–11).

80. Even Bennie Ray's seizures are not given adequate medical treatment because his parents cannot afford to pre-pay the $100 demanded for treatment at the emergency room of the hospital. (Taylor Tr. p. 11).

81. Bennie Ray's doctor advised Mrs. Taylor to take Bennie Ray to the emergency room for administration of a drug to stop seizures when he has a prolonged seizure. Bennie Ray's parents have not been able to take him to the emergency room because they lack the money to pay the hospital. (Taylor Tr. pp. 11–12).

82. Bennie Ray's parents cannot afford to give him fresh vegetables and fruits.

The family subsists mainly on starches such as beans and potatoes. (Taylor Tr. p. 11).

83. Because of their financial hardship, Bennie Ray's parents are unable to provide him with adequate clothing and adequate heat for their home. Bennie Ray does not have a pair of boots or suitable coat for the winter. His parents do not have enough money to buy these items. (Taylor Tr. p. 13).

84. Bennie Ray's father is a guard at a correctional institution and his mother is a housewife who occasionally earns some money from babysitting in her own home.

85. Class member Raymond Hale has no cash income. (Hale Tr. p. 6).

86. Although Hale receives Medicaid, his medical card does not cover dental or eyeglass expenses. (Hale Tr. pp. 8, 10).

87. Hale has problems with his teeth for which he cannot afford proper dental treatment. When Hale's teeth bother him, he works them loose with his fingers until he can pull them out himself. Hale has pulled out quite a few of his own teeth since he filed his application for Social Security disability benefits. (Hale Tr. p. 10).

88. Hale had a problem with cataracts on his eyes. He could not afford the surgery to remove the cataracts. Hale was able to have the operation only because of the assistance of the local Lions Club. The Lions Club also purchased eyeglasses for Hale. (Hale Tr. pp. 19–20).

89. Miriam Rill, who had disability and retirement income while awaiting a determination of her Social Security disability claim, did not have sufficient money to pay a lawyer $300 to pursue her Social Security disability claim. (Rill Tr. p. 14).

90. Rill pursued her claim on her own, but even long distance phone calls and travel to and from the Social Security office and doctors, necessary to pursue her claim, resulted in her ceasing to appeal her claim after she was denied a review by the Appeals Council. (Rill Tr. pp. 7–8).

91. The absence of comprehensive medical and dental coverage for class members who have severe medical impairments and who subsist on minimal incomes is likely to cause them irreparable harm in the nature of increased pain, and exacerbation of their medical conditions. (Lyons Tr. pp. 29–30, 64–65; Taylor Tr. pp. 9–12; Campbell Tr. pp. 16–22).

92. Because of their restricted cash incomes, or lack of any cash income at all, class members who are waiting final decisions from the Social Security Administration on their claims suffer such deprivations as lack of nutritious food and adequate clothing and shelter. Class members also experience other hardships, such as lack of necessary medical care, medication, and dental care while awaiting final decisions on their claims.

93. Children who are members of the proposed class, in addition to these hardships, miss time in school when they cannot get necessary medical care. (Taylor Tr. pp. 10–11).

94. Financial hardships suffered by claimants during the application and administrative determination process cause them and their families stress from the inability to pay bills and to provide for basic medical and dental care and other basic needs. (Lyons Tr. pp. 21, 23–24, 59–60; Taylor Tr. p. 25; Campbell Tr. p. 15).

95. The minimum monthly Supplemental Security Income disability payment, with no other income which was required to be considered, was $368 per month for 1989, 20 C.F.R. § 416.410, and will be increased to $386 per month, effective January 1, 1990. 54 F.R. 45801-2 (October 31, 1989).

G. *Futility*

96. Requiring class members whose claims are now before the agency to raise their claims of general bias at the administrative level before raising them in court would be a useless act.

III. Discussion.

The issues before this Court are whether this case should be brought as a class action pursuant to Fed.R.Civ.P. 23 and whether the Court should certify the named Plaintiff as a representative of the

class. This Court may certify this case as a class action if the Plaintiffs meet all the requirements of Fed.R.Civ.P. 23(a) and one of the requirements of Rule 23(b). The requirements of Rule 23(a) which the Plaintiffs must satisfy are as follows:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Failure to satisfy even one of the above requirements mandates denial of class certification.

A. *Numerosity.*

■ The parties disagree about whether the Plaintiffs satisfy the first requirement of Rule 23(a). The Plaintiffs argue that there are approximately 700 persons in the proposed class, excluding those claimants whose claims will be assigned to ALJ Rowell for a hearing in the future. The Secretary states that there are only approximately 251 persons in the proposed class and that this number does not satisfy the numerosity requirement.

■ This Court may certify a class even if it is composed of as few as 14 members. *Manning v. Princeton Consumer Discount Company, Inc.,* 390 F.Supp. 320, 324 (E.D.Pa.1975), *aff'd,* 533 F.2d 102 (3d Cir. 1976), *cert. denied,* 429 U.S. 865, 97 S.Ct. 173, 50 L.Ed.2d 144 (1976). The Court of Appeals has relaxed the numerosity requirement in cases such as this where the class seeks injunctive and declaratory relief. *Weiss v. York Hospital,* 745 F.2d 786, 808 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). In this case, the identities of many class members can only be ascertained from the Secretary's records. Thus, the class members are unidentifiable in the sense that the Plaintiffs do not presently know who they are and joinder of them is impracticable. A class of the size in this case satisfies the numerosity requirement.

B. *Common Questions of Law or Fact.*

■ The second requirement of Fed.R. Civ.P. 23(a) is that there are questions of law or fact common to the class. The Secretary argues that the Plaintiffs fail to satisfy this requirement because the claims of the class members are based on facts unique to each person. The Secretary offers as an example the fact that the Plaintiffs allege that ALJ Rowell found Plaintiff Grant not credible despite the fact that her testimony was supported by medical records.

The Plaintiffs argue that they will show that ALJ Rowell is biased in that he is predisposed in every disability case to deny benefits. The Plaintiffs intend to show that ALJ Rowell uses his discretion to determine credibility to substantiate his bias against claimants. The Plaintiffs contend that Rowell's practice has resulted in the Plaintiffs' denial of disability claims and has had or will have the same effect on class members.

■ Not all of the questions of law or fact need to be common to the class. *Weiss,* 745 F.2d at 808–09. Whether ALJ Rowell is predisposed to deny every disability claim is a question of fact that the Plaintiffs have in common with all the members of the class. The Plaintiffs and the members of the class also have in common the question of whether or not ALJ Rowell's bias has deprived or will deprive them of their right to a fair hearing in violation of the Social Security Act, 42 U.S.C. §§ 405(b)(1) and 1383(c)(1) and the due process clause of the Fifth Amendment to the U.S. Constitution. The Court is of the view that the Plaintiffs have met the second requirement of Rule 23(a) regarding the existence of common questions of law and fact.

C. *Typicality.*

■ The third requirement which the Plaintiffs must satisfy in order to obtain class certification is typicality. Typicality

is satisfied if a Plaintiff's claim arises from the same event or course of conduct which gives rise to the claims of the other class members and the claims are based on the same legal theory. *Weiss,* 745 F.2d at 809.

The Secretary states the same position with respect to the typicality requirement as with the requirement of common questions of law and fact: the Plaintiffs fail to satisfy this requirement because the claims of each class member are based on unique facts. The Secretary argues that this lawsuit will degenerate into purely individualized inquiries in order to determine the merits of the claims of any class member or class representative. The Plaintiffs assert that the function of the typicality requirement is to screen out class actions where the legal or factual position of the class representative is very different from that of other members of the class even though there are some common questions of law or fact. The Plaintiffs argue that the class claims for declaratory and injunctive relief arise from the same course of conduct by the Secretary and ALJ Rowell as the Plaintiffs allege in their individual situations.

█ In order to decide whether the Plaintiffs satisfy the typicality requirement, the Court must determine whether or not the interests of the prospective class members are fairly encompassed within the named Plaintiff's claims. *General Telephone of Southwest v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982). The Plaintiffs are not required to prove the allegations of their complaint or to prove the merits of their claims in order to obtain class certification. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). The Plaintiffs argue that the Secretary assigned the disability claims of both the named Plaintiff and class members to ALJ Rowell, that ALJ Rowell was predisposed to deny their claims, and that ALJ Rowell did in fact deny their claims. As a result, the Plaintiff and the class members were denied their right to fair hearings. We have considered these arguments and the evidence submitted at the hearing and con-

clude that the interests of the prospective class members are encompassed within the Plaintiff's claims. The Plaintiffs have satisfied the typicality requirement.

### D. *Adequacy of Representation.*

█ Adequacy of representation is the fourth requirement of Fed.R.Civ.P. 23(a). This requirement involves two factors: (1) whether the Plaintiffs' counsel is qualified, experienced, and generally able to conduct the proposed litigation; and (2) whether the representative Plaintiff fairly and adequately will protect the interests of the class and whether they have any interests antagonistic to those of the class. *Wetzel v. Liberty Mutual Insurance Company,* 508 F.2d 239, 247 (3d Cir.1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The burden to show that representation is inadequate is on the Secretary. *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

█ The Secretary does not dispute that counsel Peter Zurflieh and Larry Norton are competent, capable of fairly and adequately representing the interests of the class, and experienced in federal litigation, including class action litigation. The parties also do not dispute that one of the attorneys formerly of record in this case, Michael F. Brown, was previously a staff attorney for the Social Security Administration and worked with ALJ Rowell on a daily basis from November, 1981, through December, 1984. The parties further agree that Brown participated in the litigation of this case, including conferring with co-counsel regarding matters such as strategy, up to October 3, 1988.

The Plaintiffs argue that since October 3, 1988, Brown's role has been limited to representing Plaintiff Donnelly in his individual claim and *providing information concerning evidence which may exist to prove the claim of general bias against ALJ Rowell.* The parties agree that the notes of counsel Norton show that Norton and Brown had five telephone calls and one personal conference after October 3, 1988. Brown did not work in the same office or with the

same organization as Norton and Zurflieh. On December 12, 1989, ALJ J. Robert Brown granted Donnelly's claim for benefits, and on January 19, 1990, Brown withdrew as counsel in the case. The Court is of the view that Brown's four telephone calls and one personal conference with Norton after October 3, 1988, do not compromise Norton and Zurflieh's ability to represent the class fairly and competently.

■ The second factor involving adequacy of representation is whether the Plaintiffs will fairly and adequately protect the interests of the class. Although the case began with three Plaintiffs, only Grant remains as a class representative. The Court granted a motion by Donnelly on February 1, 1990, to withdraw as class representative. Wallace had received relief and his case was subsequently reopened apparently because of earnings by him in 1986, 1987, and 1988 newly reported and because Wallace worked in 1989. For these reasons, the Court does not consider Wallace to be an adequate class representative. The Court will dismiss Wallace as a class representative without prejudice.

■ The Court is of the view that the claim of Lois M. Grant is typical of the claims of the class and that her interests coincide with the interests of the class which she seeks to represent. Although Grant may assert individual claims in addition to the class claims for declaratory and injunctive relief, the individual claims are not antagonistic to those of the class. Grant's individual claims are that ALJ Rowell's decision which denied her benefits is not supported by substantial evidence and should be reversed by the Court. Because there is no potential for conflict between the claims of Grant and the claims of the class, Grant is an adequate representative even if she seeks relief different from that sought by the class. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 247 (3d Cir.1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975) (former employee who is not entitled to reinstatement may still be an adequate representative of the class of past and present employees alleging discriminatory employment practices on the part of the employer).

### E. *Requirement of Rule 23(b).*

■ The Plaintiffs must also satisfy one of the sections of Fed.R.Civ.P. 23(b). The Plaintiffs contend that they satisfy the following requirement of Rule 23(b):

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . .

The Plaintiffs argue that the Secretary's practice of assigning disability claims to ALJ Rowell and permitting him to determine those claims results in the denial of fair hearings to all members of the class and is an action generally applicable to the class. The Secretary claims that the Plaintiffs have not satisfied this requirement because resolution of the claims of class members requires an individualized inquiry into the facts of each class member's case.

This is a valid Rule 23(b)(2) class because the Secretary has acted on grounds generally applicable to the class and the Plaintiffs seek both injunctive and declaratory relief. *Weiss*, 745 F.2d at 811. Any injunctive relief ordered should apply to and be enforceable by past, present, and future disability claimants whose claims have been or will be denied by ALJ Rowell.

### F. *Irreparable Harm.*

■ Normally claimants must seek judicial review within 60 days of the Secretary's final decision or within such time as the Secretary may allow. 42 U.S.C. § 405(g). The Secretary opposes the Plaintiffs' claim that the Court should include in the proposed class those members who failed to obtain a "final decision" from the Secretary as required by § 405(g). The Secretary argues that the Court should not include in the class the following persons: (1) claimants who were unable to exhaust their administrative remedies at the time this case was filed because the 60-day time limits for administrative appeals had expired, barring further access to the admin-

istrative appeals process and (2) claimants who still had time to exhaust their administrative remedies at the time the suit was commenced but who failed to pursue them.

In an earlier decision in this case, the Court excused exhaustion for the claimants in the first group on the basis of the United States Supreme Court decision in *Bowen v. City of New York,* 476 U.S. 467, 482, 106 S.Ct. 2022, 2031, 90 L.Ed.2d 462 (1986). With respect to the claimants in the second group, the Court held that the Plaintiffs had established two of the three elements necessary to excuse exhaustion of administrative remedies. *Grant v. Sullivan,* 720 F.Supp. 462, 473 (M.D.Pa.1989). We held (1) that proposed class members had presented claims for benefits to the Secretary and (2) that the bias claims raised in the Plaintiffs' lawsuit were collateral to the claims for benefits that class members had raised administratively. *Id.; see also Bowen v. City of New York,* 106 S.Ct. at 2031. The Plaintiffs presented evidence regarding the third element during this hearing.

This third element which the Plaintiffs must establish in order for the Court to excuse a class of disability claimants from the exhaustion requirement is that the claimants would be irreparably injured were the exhaustion requirement enforced against them. *Bowen v. City of New York,* 106 S.Ct. at 2031–32. The Court of Appeals for the Third Circuit has applied the Supreme Court's test for irreparable harm in *Wilkerson v. Bowen,* 828 F.2d 117, 122 (3d Cir.1987), where the Court determined that injuries were irreparable when class members presented evidence of the following: serious physical and emotional medical problems; subsistence on minimal welfare payments; and absence of basic necessities which worsened their impaired condition.

The Plaintiffs in this case have submitted evidence that almost all claimants for Social Security disability and Supplemental Security Income disability benefits have severe medical or emotional impairments. Many class members who are in the administrative appeal process subsist on minimal public assistance payments while awaiting a determination of their claims. Class members often lack basic necessities. *See* Findings of Fact 40–44.

The Court is of the view that the Plaintiffs have established that proposed class members, including future applicants whose cases will be assigned to ALJ Rowell, may well be irreparably harmed if required to exhaust their administrative remedies and if the bias alleged is proved. The Court will excuse the requirement of exhaustion of administrative remedies both for proposed class members whose claims are currently pending before the agency or who are still within the period for filing further administrative appeal and for future applicants whose cases will be assigned to ALJ Rowell.

### G. *Waiver.*

The Secretary contends that the Plaintiffs did not demonstrate that the proposed class members have not waived their claims of bias. The Secretary argues that this is a critical burden because there is a presumption that hearing officers who decide claims are unbiased. *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1669–70, 72 L.Ed.2d 1 (1982).

The Plaintiffs presented a substantial amount of testimony regarding the issue of waiver because they interpreted the following section of a prior order in this case as requiring such evidence:

> [A]t least Plaintiff Grant and probably some of the members of the proposed class have not waived their bias claims. Therefore, absent some unforeseen argument by the Secretary regarding his motion for a protective order, they are entitled to proceed in this Court, at a minimum, to conduct discovery with regard to the bias issue and to present evidence to this Court for the purpose of attempting to convince us of the need for an order directing the taking of additional evidence before the Secretary on the issue of bias. *See Hummel v. Heckler,* 736 F.2d 91 at 93–95 (3rd Cir.1984).

*Grant v. Sullivan,* 720 F.Supp. at 470.

This passage did not require the Plaintiffs to present evidence on the waiver is-

sue at the hearing on class certification. The issue of waiver is not relevant to the determination of whether this case may be maintained as a class action. The waiver issue may be raised at the trial on the merits of the case if one is held. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).

#### IV. Conclusions of Law.

1. The Plaintiff class, consisting of more than 700 persons, is so numerous that joinder of all members is impracticable.

2. There are questions of law and fact common to the class.

3. The claims of Lois M. Grant as a representative Plaintiff are typical of the claims of the class.

4. Counsel Peter Zurflieh and Larry Norton are qualified, experienced, and generally able to conduct the proposed litigation.

5. Attorney Brown's five telephone calls and one personal conference with Attorney Norton after October 3, 1988, do not compromise Norton and Zurflieh's ability to represent the class fairly and competently.

6. Lois M. Grant is a representative Plaintiff who will fairly and adequately protect the interests of the class.

7. Wallace is not an adequate representative of the class of Plaintiffs.

8. Requiring class members whose claims are now before the agency to raise their claims of general bias at the administrative level before raising them in court would be a useless act.

9. The Department of Health and Human Services has acted on grounds generally applicable to the class.

10. Members of the class whose claims are still within the administrative process need not exhaust their administrative remedies before raising the claim of general bias in this court because they would suffer irreparable harm by first having to exhaust administrative remedies.

An appropriate order will be entered.

#### ORDER

1. This case shall be maintained as a class action pursuant to Fed.R.Civ.P. 23(b).

2. The class consists of all claimants for Social Security disability benefits or Supplemental Security Income disability benefits, or both, who have received, or will receive, an adverse decision from Administrative Law Judge Russell Rowell on or after January 1, 1985, and all disability claimants whose claims have been or will be assigned to ALJ Rowell for a decision.

3. Proposed class members, including future applicants whose cases will be assigned to ALJ Rowell, will be irreparably harmed if required to exhaust their administrative remedies.

4. The exhaustion of administrative remedies requirement is excused in this case both for proposed class members whose claims are currently pending before the agency, or who are still within the time period for filing further administrative appeal, and for future applicants whose cases will be assigned to ALJ Rowell.

5. The Clerk of Court shall send a copy of this opinion and order to Magistrate Raymond J. Durkin.